### DAN W. RAKER, ADM'R, v. TOLEDO & IND. RY.

1. PRIMA FACIE CASE OF NEGLIGENCE FROM ACCIDENT.

> Where, in an action for damages for the death of a workman, alleged to have been caused by negligence of defendant, the evidence shows that before the completion of a building that was to be used as a power house and ticket office for the electric railway company, certain electrical transformers were installed in an unfinished part of the building, and necessary connecting wires, carrying heavy currents of electricity were strung across the room; and that while doing necessary work in the completion of said room deceased was killed by striking his head against a heavily charged unguarded wire, a *prima facie* case of negligence against the electrical company is established, and it not appearing clearly that deceased was guilty of contributory negligence, an instruction to return verdict for defense is error.

[For other cases in point, see 6 Cyc. Dig., "Negligence," §§ 539-551.—Ed.]

2. CONSTRUCTION OF WARNING AND NOTICE OF DANGER.

> Whether or not a warning to such workman, not to touch the machinery or wires placed in a room in which he was working, should be regarded as a warning of the extreme personal danger to himself, or merely a calling of his attention to the wires and machinery which should not be disturbed, is for the jury to determine when the evidence is such as would lead reasonable minds to differ.

3. ADMISSIBILITY IN EVIDENCE OF STATEMENTS OF DECEASED.

> Where a workman is killed by striking his head against an electrical wire, while doing work required and necessary for the completion of the building, statements made by him to other workmen as to the danger of working in such place are admissible for the sole purpose of showing the state of mind of the deceased touching the safety of working there, as bearing upon the question of contributory negligence.

[For other cases in point, see 6 Cyc. Dig., "Negligence," §§ 602-606.—Ed.]
[Syllabus approved by the court.]

ERROR to Fulton common pleas court.

**Bailey, Mallahan & Conway** and **Handy & Wolf,** for plaintiff in error.

**King & Tracy** and **Files & Paxson,** for defendant in error.

## PARKER, J.

This, in the court of common pleas, was an action to recover damages on account of the death of Frank Durst, which the plaintiff alleged was caused by the negligence of the defendant. After the testimony on behalf of the plaintiff was in, the court directed a verdict for the defend-

Raker v. Railway.

ant, which was returned, and judgment was entered upon it. The question presented for our consideration and determination is, whether the court erred in so directing the verdict.

The Toledo & Indiana Railway Company operates a railroad upon which the cars are propelled by electricity. At one of its stations, Pettisville, it has a station house, and in one of the rooms thereof it has certain electrical machinery and apparatus—specifically, three transformers of electricity and one other machine the name of which I do not at this moment recall. A. L. Guthrie was employed by the railroad company to construct this building, and he with his employes did so. Before it was finished, however, the company installed this machinery in this apartment of the building.

It seems that in connection with this machinery, leading to and from it, were electric wires carrying a very strong current of electricity, said by the witnesses to amount to 13,200 volts, which, it is admitted, is a deadly current to one coming in contact with it. These three machines were set up close together upon the west side of this room. There were a variety of wires in this room, but the particular wires carrying this high voltage came into the building, somewhere near the ceiling of the room, then came down the walls to near the top parts of these transformers, then they were carried across to the tops of the transformers. That brought the wires to within four feet or four and one-half feet of the floor. The transformers were situated within from twenty to twenty-four inches of the west wall. On the west side of the room was a door leading to the outside of the building. On the east side was another door leading into the ticket office and waiting room.

A part of the work which remained for Mr. Guthrie to do was to hang this door at the west end or side of the building with certain heavy weights whereby it might be operated, and another part devolving upon him was the putting in of cement floors. It appears that he had been called upon by Mr. Darrow, the general manager of the company, shortly before January 12, 1906, to finish up his work upon the building, that he had had some conversation with Mr. Darrow about the apparatus and wires in the room where he would be required to work, and, according to the testimony of Mr. Guthrie, he had been assured by Mr. Darrow that there would be no danger in his proceeding with his work at that place.

The deceased, Frank Durst, was one of the employes of Guthrie, and upon January 12, 1906, he was, under the direction of Guthrie, put to work putting down the cement floor in this room where the electric wires and apparatus were situated. It does not appear, directly at least,

Fulton County.

that Mr. Durst had been informed of the conversation between Guthrie and Darrow respecting the danger or safety of the place, but there is testimony tending to show that Durst had been warned or cautioned by Guthrie and had been warned by the station agent, Mr. Laver, that he should be careful about the machinery and the wires—that he should not get against them. By most of the witnesses who testified upon this subject it is not stated definitely that he was warned that there would be any danger to him in so doing. For aught that appears in most of the testimony, it was simply a warning that might be construed to mean that he might do some damage to the wires or machinery by getting against the same. But by one witness it is said that he was warned that the machinery and wires were dangerous.

He worked at the floor to the eastward of these machines during the forenoon of that day. Shortly after the noon hour, Mr. Guthrie came to the place and set about hanging this door or hanging the weights to the door. One of the weights was inside of this room near the door that opened between this room and the waiting room. It appears that the most direct and convenient way to convey that weight to the door to which it was to be fastened, to the place where it must be hung, was the way pursued, to wit, by carrying it toward the westward, to the southward of these machines near to the wall, and then between the machines and the west wall to near the northwest corner of the room. In doing this, it was necessary to go under these wires carrying these powerful currents of electricity.

Frank Durst, at the request of Guthrie, took hold of one end of the weight which was lying on the floor, which appears to have been somewhat bulky, perhaps ten or twelve inches wide and twenty to twenty-four inches long, weighing from ninety to one hundred pounds. Mr. Guthrie took hold of the other end, and together they carried it, Mr. Durst proceeding backward, Mr. Guthrie following, Mr. Durst in a stooping position, Mr. Guthrie also, as he passed under the wires, necessarily in a stooping position. So that they both passed safely under those wires. About that time, Mr. Laver, to assist the parties, climbed upon a ladder set up against the west wall, the top of it resting over the top of the door, the bottom upon the floor, and stood in that position, giving some directions. The weight was laid down by these men who had been carrying it, and Mr. Durst appears to have arisen to a standing or upright position, and in doing so brought the back of his head or neck in contact with one of these wires, the one, we judge, which led from the northermost of these transformers over to the wall— the one near the northwest corner of the room. He was not noticed in

Raker v. Railway.

·the act of making this movement, but at the time he reached the upright position and struck the wires he made some exclamation which attracted the attention of those present, and they say that he at once straightened up and apparently became rigid and then fell forward to the floor, and they carried him out in an unconscious condition, and in about ten ·minutes he died.

The negligence charged against the company is, that it failed to keep the deceased away from this wire by· guarding it or barricading it properly, and that it failed to insulate the wire sò as to make it safe for one working in and about the building, and that it failed to give him specific warning of the danger of working in that place; in short, ·that it put him in an unsafe place to work without proper safeguards ·or proper warnings so that he might take care of himself.

We think there can be no question but what a *prima facie* case of negligence was made out against the company. As we understand it, it is hardly contended, on behalf of the defendant in error, that that is not true. We believe it was such a case of negligence as the court would be required to submit to the jury. But it is said that the case was with- ·drawn from the jury because it was apparent from the evidence intro- duced on behalf of the plaintiff that the deceased was himself guilty of ;such contributory negligence as would have defeated his right of recovery had he lived and sued on his own account, and such as would, therefore, ·defeat the right of recovery of those suing on account of his death.

This conclusion of the court of common pleas appears to have been based upon the evidence touching the warnings given to the deceased, as well as upon the other circumstances. Now, the general rule upon the ;subject is, as we understand it, that where reasonable minds may differ ·in their views and conclusions as to whether a party is guilty of negli- gence—that is, as to whether, upon the facts, applying proper rules of law and properly construing the facts, he is guilty of negligence— the case should be submitted to a jury. It is only where negligence is so .apparent, so clear, that reasonable minds could not differ about it, that a court is authorized to withdraw the case from the consideration of the jury. Was this a case that might be properly withdrawn from the con- sideration of· the jury?

As bearing upon the conduct of the deceased, it should be borne in mind that his employer, and he, through his employer, was directed to work there in that place at a certain kind of work in the finishing up ·of that building and room. The hanging of the door was a part of the ·work. Doing that, it seems to us, must almost inevitably bring them

Fulton County.

into dangerous proximity to these wires. There was no effort made to shut off the current, and they appear to have been advised that they would be expected to work while the machines were in operation, while the current was flowing. Not only were they expected and directed to do that, but the cementing of the floor, which had not yet been finished, upon the west side of these machines, in that little narrow space or alley between the machines and the west wall of the building, devolved upon them, and it appears that they were expected to do it without the current's being cut off, and this work must necessarily bring them into close and dangerous proximity to these wires, so that a misstep, any unconscious movement, might result in instant death to the person thus employed. This, to our minds, not only discloses culpable negligence upon the part of the company, but it reflects a light upon the conduct of the deceased; because unless we are otherwise convinced by most potent evidence, we would conclude that the deceased must have supposed that those wires were less dangerous than they in fact turned out to be; otherwise, he would not be apt to do that kind of work in that kind of a place.

To merely say to him, if it was said to him, that the machines were dangerous and that the wires were dangerous, would not, in our judgment, be adequate warning of the extreme danger, not simply of some injury which might be of a trifling nature, but of the extreme danger of instant death resulting from coming into collision with those wires. If, after being warned of the danger of the wires, the deceased had voluntarily approached them and come in contact with them consciously, purposely, the case would be quite different; but it appears that he came in contact with this wire accidentally; that he had backed into this position; that his position was such that the wire was behind him and slightly above him. For aught that appears, he was at that moment unconscious of the presence of the wire in that place. For aught that appears he had never been apprised, either by having it pointed out to him or otherwise, of the presence of the wire in that particular position or place. And when he came to do the very natural thing of straightening up, after laying down the weight, he accidentally came in contact with the wire and was instantly killed.

We must regard this, then, as an accidental contact with the wire; and the question is presented whether, under all the circumstances, this accidental contact with the wire upon his part makes it clear that he was guilty of contributory negligence precluding recovery. After a full consideration of the matter and much discussion we have arrived at a different conclusion from that which seems to have influenced the direction of the jury by the learned judge of the court below. We think the evidence

Raker v. Railway.

of contributory negligence is not so clear as to justify withdrawal of the case from the jury, and that the order in that respect was erroneous.

Another question is presented by this record. James Bundy, a fellow workman of the decedent, was produced as a witness on behalf of the plaintiff. He was at this place upon this day. It appears from his testimony, as well as from other testimony in the case, that Mr. Durst was not familiar with electrical apparatus and wires and currents, and was probably not aware of the ordinary dangers incident to such things. Bundy was asked:

"Q. I will ask you to state to the jury, if you know, what, if any, information, Mr. Durst had received as to this being a safe place to work? A. He told me it was a safe place."

That answer: "He told me it was a safe place" was allowed to stand. There was no motion to take it from the jury, and no objection made. But we take it that the scope of the argument upon what follows would include it in what counsel for defendant in error conceive to be improper and inadmissible testimony in the case, and, as the matter is to go back for retrial, unless some higher court entertains a different opinion about it, we will express our views as to this as well as to what follows:

"Q. What did he say to you? (Objected to by Mr. Files on the part of the defendant; question withdrawn.) Q. I will ask you what, if anything, Mr. Durst said to you with reference to Mr. Darrow, the general manager of the road, having said it was a safe place to work? (Objected to by Mr. Files on the part of the defendant; objection sustained; to which ruling of the court Mr. Handy, upon the part of the plaintiff, then and there excepted. Statement of proof: The plaintiff expected to prove by the answer of the witness to this question that Mr. Durst stated to him on the morning of the day he was killed that Mr. Darrow, the general manager of the company, had stated that it was a safe place for the men to finish that work.)"

Now, one of the important questions here was as to the state of mind of the deceased upon this occasion, the information or lack of information that he possessed as to the dangers incident to his occupation at that time and place. Manifestly, it would not be competent to introduce this evidence for the purpose of showing that this was a safe place, nor for the purpose of showing that Mr. Darrow had said that it was a safe place, but was it not admissible for the purpose of showing the state of mind of the deceased, and therefore reflecting light upon the question of whether he was guilty of negligence? For whether he was guilty of negligence or not must depend in a measure upon the knowledge or information that he possessed or that he supposed he possessed

touching the safety or danger to him of the place and his employment then upon that occasion.

Generally, evidence of this character would be denominated hearsay, and perhaps self-serving declarations, an objectionable kind of hearsay; but the rule as to self-serving declarations does not apply where it is quite apparent from all the circumstances that the declaration is not made for the purpose of being self-serving. As evidence to establish that it was a safe place, or that Mr. Darrow had said it was a safe place, it would clearly be hearsay, and, therefore, inadmissible; but as an expression or declaration indicating the state of mind or belief of the deceased at that time and place, we do not regard it as being opposed to any rule of law of which we have knowledge.

In the case of *Norman* v. *Will,* 1 Dec. Re. 269 (5 W. L. J. 508), which was an action to recover back money paid upon notes by mistake, this is said in the syllabus (I should say this is an opinion by the Supreme Court of Ohio sitting in Gallia county at the March term, 1846, and April term, 1847, for they had the case before them on two occasions):

"Money paid under a mistake of fact can be recovered back. Such mistake consists in the present belief of the party paying the money, that it has not previously been paid."

"The declarations of the party, made to one holding his note, between the times of the two payments, recognizing the note as a subsisting note, are admissible in favor of such party, to show that he believed the note was not paid."

The note had in fact been paid, but Norman not being fully advised of the fact by reason of the peculiar circumstances which are set forth in the case, went to an officer of the bank and talked with him in such a way as to disclose that he supposed that the note was not paid. He afterwards paid it. Still later he discovered that his payment of the note was a mistake, for it had been previously paid. Thereupon he undertook to recover back the money paid by mistake, and in support of his contention that he paid it by mistake he undertook to prove what he himself had said as indicating that he was laboring under a misapprehension—that he was mistaken about the state of the case. The trial court, over the objection of the defendant, admitted the evidence, and this was assigned for error. The Supreme Court held that it was admissible, citing a number of authorities.

Another decision of our Supreme Court is more nearly in point perhaps. It is the case of *Railway* v. *Herrick,* 49 Ohio St. 25 [29 N. E. Rep. 1052]. It went up from Huron county and Judge Wildman, of

Raker v. Railway.

this court, was one of the attorneys, and his contention respecting the matter which is important here was sustained by the Supreme Court. It was a case wherein Herrick undertook to recover from the railroad company for damages resulting to him by being struck by a train which came into a certain station on time and which he had been informed and supposed was late, and his misinformation upon the subject was one of the things that explained his action in coming in contact with the train. It is said in the syllabus:

"Where, in such case, it became material to establish that the plaintiff was at the station to take passage on one of its trains, a declaration, made by him as he left his house on his way to the station, that he was going to another station on the same railway, is competent evidence to establish his character as a passenger."

That was one of the points in issue of course. It will be seen, I think, from the opinion, that the court goes even further than that and allows evidence of this character to establish not only his character as a passenger but to establish his state of mind upon that occasion,—precisely the thing which we deem it important to establish in the case at bar with respect to the deceased. (Reads from opinion beginning on page 27.)

The Supreme Court points out that it is very material that the court below should be advised of its views upon this evidence, because the case was to go back for a new trial, and in the meantime the plaintiff had died, so that it would be very important that this evidence of what the plaintiff himself had declared should be admitted upon the retrial of the case; which brings the case in some of its aspects very close to the case at bar.

In looking into this matter we consulted the last edition Greenleaf on Evidence, under the head of "Hearsay Evidence," and we became very well satisfied therefrom that upon general principles this evidence should be admitted, and we found many cases there cited so like the case at bar as to be fairly in point. We do not find that edition in this city, so we cannot now give precise reference thereto.

On account of the error of the court in giving this direction to the jury to return a verdict in favor of the defendant, and on account of the error of the court in excluding this evidence, the judgment of the court below will be reversed.

**Haynes** and **Wildman, JJ.,** concur.